Final case set for argument this morning is Longe v. City of New York, No. 19-877. Good morning, Your Honors.  My name is John Skolom. I'm here on behalf of Appellant Adekunle Longe. I'd like to start with the statute of limitation issue. The way that the police department works when it comes to promotional opportunities is a police officer must take an exam and then he gets put on a list. Depending on the police officer's history, he might be denied promotion and must be put in front of the Career Advancement Review Board, which is known as CARB. The denial of the promotion is not in effect until the third time he goes before the CARB board. The first time he goes, they might say, you need to go back and work on your performance, but you'll have another chance in, say, a year, which is the case here. Then that might happen again. The ultimate denial of the promotion is the third time that he's denied. So they're all reasonably related to the last denial of the promotion. It wouldn't make sense for a police officer to allege that there was discriminatory intent from the first denial if he still has an opportunity to be promoted later. As such, I think the court, the district court erred in not including the first two denials of promotion and the acts of commanding officer Schell, which basically caused my clients to not ultimately get promoted. What are your one or two most compelling pieces of evidence that this denial of promotion was related to race? My client is an African American. There's testimony of another officer who speaks with an accent, who was also treated improperly, basically testified that commanding officer Schell also treated him improperly because of his accent. Before we get to the comparators, let's stick for a moment with your client. What do you point to as really compelling evidence that any of this had to do with your client's race? My client basically testified that he was treated differently than other white officers. That's a conclusion. What happened? Well, there was a comment made about he should have taken out the trash right before he spoke about an African American janitor, which my client believes shows his true motives. There's not an overt comment. What else besides that? Well, there's that. Garbage comment. What else? There's the garbage comment. There was the assignment to the cell attendant duties, which he – my officer I thought the testimony was that that rotated. It was, but it didn't rotate in this instance. My client was there for three months, which is directly tied to his evaluations, which is the basis for him not being promoted. There's not an overt comment. There's not – what we have is a history of my client being denied promotion and supervisors actively attempting to – As I recall, did I get that right? That's correct, Your Honor. So, I mean, this is a question of whether, you know, this isn't – we're not sitting as a super – as a super reviewer of human resources departments and whether or not, you know, they treat their employees properly. It has to be tied – it has to be a racial discrimination that has to be proved. And if another African American received a promotion or if you don't have white comparators or you have – don't have something beyond a stray remark or two that has to be interpreted, as your client did, why isn't this just a routine employment dispute, breach of contract or not? My client believes that he was treated differently because he was African American. We have the testimony of other police officers that this commanding officer treated people with accents as second-class citizens. Then there's another example of a complaint of discrimination from an administrative aide against the same commanding officer. This commanding officer acted – he changed the evaluation of my client. He actively did not recommend him for promotion. He put him in a place – Why isn't that consistent with the fact that he did something – he breached the contract or he – maybe he reached a conclusion that your client doesn't agree with about his work performance? Why isn't all that perfectly consistent with that? I mean, it could be – It's not having to do with race. It could not have to do with race. But in this instance, my client believes that it did have something to do with his race. There's a history of discriminatory acquisitions against this commanding officer. There's no overt racial comment. I mean, there's the one remark, but it's not – discrimination is not really open for – usually for everyone to see. But the way that he was treated was different than the white officers in this command. Multiple – That's what he tells you. Yes, yes. That's what he believes. This is what he believes and what another officer believes as well, police officer Lorca. I think the belief of my client, the adverse actions which he suffered which was not being promoted, and the corroborating testimony of police officer Lorca that this commanding officer treated people with accents as inferior is a sufficient question of fact for a jury to decide. As for the retaliation, my client ultimately made a complaint with the Equal Employment Opportunity Office in the NYPD after his – like about a month after his lawyers filed a letter with the NYPD Legal Bureau. Two days or like a couple days after my client files this complaint, the Borough Patrol for Brooklyn happens to show up to his precinct to basically surveil somebody. My client was on vacation. He got back from vacation. They happened to come back there two weeks later. He gets switched from the telephone switchboard operator to patrol and then they surveil him, ultimately leading to a command discipline which he disputed but was The temporal proximity and the circumstances surrounding that, namely that commanding officer Schell was a colleague of Lieutenant Anderson. Both were the same people accused of discrimination by administrative aid years earlier. Lieutenant Anderson is the one actually surveilling my client and I believe that act was retaliatory. Thank you. Okay. We have two minutes of rebuttal. We'll hear from the city. May it please the Court. Alan Rosinas for the three city appellees. Let me touch briefly on the statute of limitations issue that my friend and colleague on the other side has raised. It really doesn't matter, Your Honors, whether this is a continuing violation or whether — I mean, if the way that the plaintiff wants to view this is, well, it doesn't — the claim doesn't come to fruition until the third action, then we're really talking just about the third card panel. I think our argument about the statute of limitations is to the extent that he has a separate claim on the basis of the first and the second card panel decisions, those are time-barred. So it's really a distinction without a difference in practice. But let me turn to the discrimination claim first, and I'll touch on retaliation at the end. This case — the most important thing to recognize about this case, Your Honors, is it does not — is that it does not get past prong one of the McDonnell-Douglas test. And it's clear here today why not. This is just speculation on the part of the plaintiff. He has nothing he can point to that there was any discrimination here whatsoever. And when you go through the list that my colleague gives, starting with Officer Lorca's testimony, the first thing he brings up, Officer Lorca said that he spoke with an accent, and he said that Captain Schell didn't treat him properly in some ways. There were some arguments that they had, one of which was when Officer Lorca walked in on a roll call, and he actually seemed to feel bad about that. Another one was when they met. But the bottom line with that deposition testimony is there's no indication of that testimony that it was because of his race or because of his accent. And that's why the district court said it's — even his testimony is speculative, even as to Officer Lorca himself set aside the — which doesn't even necessarily connect to the plaintiff in any event. As for the assignment to cell attendant duties, there's undisputed testimony in the record by both Captain Schell — and actually, Captain Schell is no longer a captain. He's been promoted, but I'll call him Captain Schell for these purposes. That's the way he was at the time. Captain Schell and Sergeant Lung, who was — during the period that the plaintiff was under Captain Schell's command, Sergeant Lung was one of his two supervising sergeants. And Sergeant Lung testified. Captain Schell agreed that there was this argument that occurred between the plaintiff and Sergeant Lung, actually right after his second CARB appearance, where Sergeant Lung asked him how things had gone. And Lung says that the plaintiff yelled at him. The plaintiff says — denies yelling, but he says he got emotional. So either way, what happened was then it was reported secondhand to Captain Schell — excuse me — that Officer Lunge, the plaintiff, had been insubordinate to Sergeant Lung. And we know from this Court's opinion in McPherson that it doesn't matter what the truth is. What matters is what the officer — what the employer knows, what the employer understands to be the case, the motivation — that affects the motivation. And that's the key inquiry. And that's 457F3-211. The third basis that my colleague gives is the — oh, let me say quickly about solitand duties. Also, it was only for three months, and there's no indication in the CARB panelist that the supposed diminishment and — diminution of arrest numbers had any influence on the CARB panelist's determination thereafter in any event. The taking out the trash comment. This comment, Officer Lunge himself, on page A330 of the record, disavows that this comment — it was the plaintiff himself — disavows that this comment was discriminatory. He was called up by an NYPD EEO officer to talk about it, and the plaintiff himself said to that officer, yeah, he was just telling me to go above and beyond. He was — he was saying, go the extra mile for the people that are going to be deciding your promotion. So, I mean, that, to me, ends the case as to the idea of that being discriminatory. You have the plaintiff himself, who is the one in the room with the captain, with the defendant, saying, yes, that he didn't mean it literally. What he meant was, go the extra mile, which, if anything, is encouragement and advice. As for the allegation about the complaint of discrimination by another person against Captain Schell, that in this record is hearsay, and it also is — there's no indication that that was proved. So it's really irrelevant to — there's no way that that's going to help the plaintiff make a prima facie case. And then as for the allegation that white officers were treated differently, the only thing I can recall in this record that he alleged is a specific instance of that was a case where the sergeant involved was named Sergeant Graziano, and Officer Lolling is basically saying Sergeant Graziano said that — sorry, Officer Lolling and a white officer reported to the desk, the sergeant's desk, and the sergeant docked him for being late, gave him a notation for being late, and did not give it to the white officer. But Sergeant Graziano, in a sworn declaration before this court — or before the district court, excuse me, said, well, that officer was in a different squad. He was not the officer — he was not late, in fact, at all. He had reported to his own desk. So, again — and that was not — there was no evidence to contradict that. So, again, no evidence of differential treatment there. So, really, nothing that gets you past prong one. But as for prong two, there is a tremendous amount of evidence of the disciplinary problems that this officer had, both before, during, and after the time that he was under Captain Schell's command. So, you even take away the only named defendant here, and you have disciplinary problems. And also, he had recurrent problems three times during the relevant period of being designated chronic sick A, which means sick for at least four times without, you know, time of duty, et cetera, excuse, over a 12-month period. But the disciplinary problems were extensive and continuing. He was repeatedly talking back to sergeants. I mean, he — there was one time when a sergeant — you know, he would get an assignment, and the — for instance, he went, and the sergeant said he was late, so he was going to get time added on, and gave him an assignment. And he said, I'm not going to do that. Give me a command discipline if you need to, which is a police discipline that's given to preserve the command structure. And he stormed off. He was absent without leave for, I think, about an hour. Another time, he failed to voucher marijuana evidence and said, threw it in the trash, even though he was told by — explicitly by his supervisor, voucher it, please. And he also failed to charge the suspect who's — from whom the evidence had been seized with marijuana possession. So, two problems there. And then the leader said he forgot about it, which — there was some indication that he may have been dissembling a bit in saying that he had forgotten about it. So, there are other — there are many other instances in the brief. My time is getting short, so let me just say that the bottom line is, there certainly is plenty of evidence of legitimate non-discriminatory — of a legitimate non-discriminatory basis for each card panel's determination, certainly the third card panel's determination, which is the pertinent determination. And even if you look at the slightly more liberal city law on discrimination, which — where the bar for adverse acts is — for what constitutes an adverse act is low, if not nonexistent, as long as it's adverse. Again, no evidence of any discriminatory act here at all. On the retaliation point, the most important thing to understand is that the evidence is not disputed that the retaliation — excuse me, that the targeting of plaintiff for patrol monitoring was random. Lieutenant Howery, who was one of the two officers who did the monitoring, said, on that day, my partner and I chose randomly from among the 13 precincts in Brooklyn South. We also went randomly to the first call — the closest call that came in. So both the precincts and the particular case, the particular assignment was random. The — he — Lieutenant Howery testified that he didn't even have a roll call for that day, so he didn't know that Officer Longe was on patrol duty rather than desk duty. The allegation that my friend on the other side refers to about Lieutenant Howery knew this — or Lieutenant Anderson, his partner, knew this — Captain Chell, and so they may have coordinated and somehow wanted to target him, well, A, that's very speculative. B, at least some of it is based on hearsay, like the idea of Lieutenant Howery supposedly picking up the roll call, which Lieutenant Howery under oath denied. And C, it just doesn't — it doesn't affect the testimony — it doesn't touch the sworn testimony that the targeting was random, not to mention, again, it's extremely speculative, not a basis for any prima facie case on retaliation either, just as well as discrimination — just like there's no prima facie case on discrimination. So we ask the Court affirm. Thank you. Thank you very much. Mr. Scully, you have two minutes. Just to address the disciplinary issues, when Captain Chell moved on and Police Officer Longe had a new commanding officer who actually recommended him for promotion, he classified him as quiet, reserved, and respectful. Now, that's directly contrary to all these other allegations that come from the same commanding officer that actively tried to prevent promotion for my client. On the third CARB — after the first two CARB hearings, my client was told to go improve his performance, and if he did, essentially that he would be promoted. Well, he did do that. He increased his performance evaluation. His commanding officer recommended him for promotion. One of the chiefs in charge on the three-person panel of CARB actually tried to call his commanding officer to get him to change his recommendation, and then ultimately he was still denied. So he did everything that he was supposed to do, and then was ultimately denied promotion. I think that the temporal proximity of the retaliation, coupled with my client being told that the roll call was actually given to these investigators, is a sufficient question of fact that a jury should decide. Thank you very much. Thank you very much. We'll reserve decision. That concludes our oral argument calendar for today, and so the clerk will please adjourn court. Thank you.